Go to the next case on the calendar, GE Funding. May it please the Court, Gregory Joseph for Appellant Nypha. GE's jurisdictional argument does not apply to the appeal on prejudgment interest, which wasn't susceptible of a Rule 50 motion. Our position, which is clearly explained, is that we're appealing an issue of law which, under the precedent of this circuit, does not require a Rule 50 motion to renew if it's been decided in an interlocutory order. And under New York law, whether or not an agreement is ambiguous is determined by the terms of the agreement. So for jurisdictional purposes, the issue we've identified is an issue of law, and it's not necessary to consider facts to determine that the issue is an issue of law. When we look at the merits of the issue, then GE's custom and usage evidence enters the picture, and then the question is another legal question, and that is, can it properly be received for the purposes for which it was offered? And the answer is that it may not. Could I ask you just something to clarify for me? Yes, Your Honor. And here, correct me if I'm misunderstanding. You seem to be raising on appeal only the issue decided in the order, denying your motion for partial judgment on the pleadings, whether the investment agreements are, on their face, ambiguous. And if that's the case, in what sense are you also appealing the summary judgment order, which weighed the extrinsic evidence of the investment agreements' meaning? On page 7 of the summary judgment order, which is page 17 of the special appendix, the judge says, whereas here the court has determined that the agreement is ambiguous. So it reiterates that finding. That's the only way that we're doing that. We're not challenging the evidence on appeal. That would require a Rule 50 motion, and we did not make that motion. So it is only the pure legal question whether, on their face, these agreements are ambiguous. And they're not, Your Honor, and the custom and usage evidence that GE offered was inappropriately received, and that's because custom and usage evidence. I'm sorry, but you initially are saying that we could look at the investment agreement and maybe the other agreements that were all part of this investment package . . . Yes, Your Honor. And determine that the district court was wrong in concluding that it was ambiguous as to whether they terminated on the redemption of the bonds. Correct, Your Honor. And so you say the district court has erred in determining that it was ambiguous. So we don't even need to look at the custom and usage evidence. Is that right? That's correct, Your Honor. And I'll just spend one moment on it to say that it would have been appropriate to use custom and usage evidence if there had been some evidence that one of the apparently unambiguous terms had a specialized meaning in the industry, but there was no evidence to that effect. And they have citations to the record at pages seven and eight of their brief, and if you look at those citations, the expert very ably explains what the terms mean, but doesn't suggest they have any meaning other than as they are defined in the agreement. Our case relies only on the express terms of the agreements, the investment agreements and the indentures they incorporate. The only time an ambiguity exists is if you accept GE's implied terms that the accounts created by the investment agreements either disappear on bond redemption or cease to hold funds, and there is no provision in the investment agreements that say that. GE says at page 31 of its brief that that's logical. Our position is it is not logical to be implying terms into integrated, complex agreements between sophisticated parties. So is it your view that let's say that none of the events triggering early termination occurred? Correct. That GE would be required to continue paying the interest at the rates originally negotiated until 2026? Yes, Your Honor, and we all look at things now with the hindsight of 2008. Had 2008 not happened, GE might be considering the commercial reasonableness of these extremely wise, because before 2008 everybody was trying to get deposits. Now the interest rates are high. That wasn't historically the case. And normally you'd expect interest rates may revert to the mean, but you wouldn't expect the extraordinary levels we've had. So that's why we have an agreement that says that it terminates in Section 2.2, the duty to pay interest terminates in 2026 or whenever the specific date is in Exhibit A of the particular investment agreement. That's what the deal is. And these agreements contemplate use of the funds after bond redemption. They contemplate them. For example, the definition of float fund in the investment agreement includes the revenue fund accounts. In Section 2.3A of the investment agreements, it says that float fund withdrawals may be made for permitted withdrawal purposes. And the definition of permitted withdrawal purposes are any of the uses permitted in the revenue fund provision of the general indenture, which is Section 5.03. And if you look at 5.03B1, it permits use of revenue fund uses for debt service, and it says debt service on any interest payment date, which is defined in terms of all bonds, not just bonds in any particular series. Don't you have to convince us not that your interpretation is reasonable or correct, but that it's the only one? And so you need to show, because the district court found that there were two competing, irreconcilable, reasonable interpretations of this complicated set of agreements. And so you need to demonstrate that your opponent's interpretation is untenable. Yes, Your Honor. Just on the face of the document. So what is the key? What's your strongest point for that position? The agreements specifically contemplate uses after the withdrawal or after the redemption of the bonds. They specifically contemplate that interest is going to be paid until the termination date. They have withdrawal or termination. Your opponent would say that the definition of investment doesn't reach that far, that once redemption has happened, there are no more investments. But, Your Honor, I was just explaining why that's completely wrong if you look at the definition of float fund, because the investment includes the float fund. The float fund says you can use it for the uses permitted in the revenue fund provisions in the indenture, and it's clearly wrong because that doesn't require, nothing stops that at the time that the bonds are redeemed. The indenture is still active. This indenture has been active since 1994. It's the only indenture NIFA uses. It's not just the GE bonds. It's in use. And that's why when 501C of the general indenture and 402B of the supplemental indenture say that you can use these to deal with other bonds, they mean it, and there's nothing in this indenture that says to the contrary. And there's no warrant to be using, they used custom and usage evidence to convince the court, and it was inappropriate because you can't vary or modify the terms, and they're modifying it to add termination provisions for these accounts created by the investment agreement that do not exist. So, Your Honor, with all respect to the very distinguished district judge, it was simply erroneous to say that these were ambiguous. I'd like to spend a moment, I've got no time. I'd like to spend a moment on prejudgment interest. I was just going to ask you that question. Thank you, Your Honor. GE had unrestrained use of the amounts that it credited to NIFA as interest. There was no evidence that its use was in any way affected by the fact that there was a liability on its balance sheet. What sort of evidence would it need to present? There's the example given by GE that it could not use money on a new building. And your argument, I think, is that GE, in part, needs to offer evidence of opportunities like that that it could not avail itself of. What sort of evidence would it need to present? I would say that there is case law in this circuit that holds that the existence of a liability when you have the use of the money does not permit the drawing of prejudgment interest. In the bulk oil case, the plaintiff who won a contract action was not given prejudgment interest on the contract price because it had taken out a loan. All that was awarded was the interest payments on the loan and the prejudgment interest on the interest payments, but the court held it had use of the money. Now, a loan is a liability. It was irrelevant. In the Donald Sheldon case, the trustee in bankruptcy was seeking attorney's fees from the date it received the bills, prejudgment interest on attorney's fees from the date it received the bills. Bills are a liability. The court held you had use of the money until you paid. Here, they didn't pay. And they didn't — the way they presented evidence, they had an expert who just said it's the return on capital for GE. Now, if they wanted to say that GE's return on capital as a whole is affected by the fact that a certain percentage of this is reflected by liabilities, they could have had that expert address it. But they never had the expert address that. So, Your Honor, on prejudgment interest, they had the money. There's no evidence that they couldn't use it as they chose. It was an immaterial amount to GE also, but there's no evidence that they didn't use it as they chose. Thank you very much, Your Honors. Thank you. You'll have two minutes in rebuttal. Thank you very much. Good morning. May it please the Court, Stephen Shackelford for the GE entities. I'll start where Mr. Joseph started, which is this question of what a court under New York law is to look at when determining ambiguity. And Mr. Joseph said that it has to be determined by the terms of the agreement and that it was improper for any evidence of custom and usage to come in at that stage of the analysis. That is the exact position that this court rejected in the International Multifoods case. In International Multifoods, the court held that the district court had erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed. That was at footnote four in that case. So New York law is admittedly unusual in this one respect. That is the one variety of parole evidence that can and indeed must come in if it's presented and be considered as part of the ambiguity determination. Haven't we held in Luitpold Pharmacy that whether disputed contractual terms, I'm quoting, are ambiguous is generally discerned from the four corners of the document itself? Yes, Your Honor. And that is the normal rule when you don't have the industry custom and practice introduced into the equation. But this court has frankly affirmed numerous summary judgment cases where industry custom and practice evidence was introduced in an attempt to influence the ambiguity analysis. And in each of those cases, the court has affirmed it while recognizing that the industry custom and practice evidence must be addressed. And the court in those cases addressed it. That's the British International Insurance case and the Law of Devonshire case and the Sampo Japan case. So it's simply black letter New York law that industry custom and practice evidence is properly before the court at the ambiguity determination and must be considered. So the next move that NIFA makes, trying to avoid that here, is looks at our record sites where we cite industry custom and practice evidence that came in at trial. That is precisely what the Rule 50 motion would have done. The Rule 50 motion would have given the court a chance to consider ambiguity based on the full trial record, not based on the pleadings, but based on the fully developed trial record and determine whether custom and practice evidence that either party had introduced during the trial should influence the ambiguity analysis. We introduced a lot of custom and practice evidence, industry custom and practice evidence at trial. NIFA would like to argue, well, it wasn't credible or it wasn't the right kind or it didn't really go to the right terms. But all of those were arguments that should have been made first to the trial judge who sat through the trial and could have assessed that. And we would have then had the chance to make the argument in that briefing where it were to have happened that our industry custom and practice evidence we put on at trial further buttresses what we do consider to be the correct ambiguity ruling in the first place. I have a question. You can help me with this. It's somewhat confusing to me. You say, and correct me if I'm misunderstanding, that when NIFA redeems a series of bonds, there is, and I quote, no longer an account that's established in connection with those bonds. That's in the red brief at 23-24. But it would seem that there were accounts that survived the redemption of the associated bonds, I understand, in your view, improperly, and you paid interest on those accounts. So as a technical matter, what do you mean when you say there is no longer an account post-redemption? So there are two different issues going on with that particular question, Your Honor. The issue having to do with the indenture is this issue as to whether a capital A account survives bond redemption. That's an issue where the indenture is ambiguous as to that. Now, as we tried to explain in our briefing, the Court doesn't need to get to this question of whether a capital A account, which is a construct of the indenture, continues to exist as a construct after bond redemption because we point to language that the Court has spoken about earlier, which is the in connection with language out of the definition of fund. So even if a capital A account still existed under the indenture, this construct, it would still not be an account in connection with the bond series once that bond series has been redeemed. That is a reasonable reading of the definition of fund, and that is indeed what Judge Schofield and Judge Fela both found, that sort of reading was reasonable under the two contracts. Now, as for the question of whether the capital A account, which is a term that is incorporated by reference in the GICs, whether a capital A account continues to exist, you look at 5.01c of the general indenture at page 281 of the appendix, and the key sentence there says, there is hereby established in each fund a separate account for each series of bonds. It seems like a simple sentence. One problem is at the date that this general indenture came into being, there were no series of bonds. The indenture came first, and then various series of bonds were originated. So it is at least reasonable to read that sentence as saying, providing for the possibility that different bond series will be issued, at which point different accounts will materialize as a concept for accounting purposes under this indenture, and it is reasonable to assume that once those bond series have gone away, those particular accounts that did not exist at the beginning of the general indenture would also stop working, would also cease to exist. And what would happen instead, and what there was testimony about at the trial happened in real life, and the site there is from one of NIFA's own employees at page 1376 of the record, is in real life when the bonds were redeemed, NIFA stopped tracking any funds that at some point had something to do with a redeemed bond series. They left it all in the general capital F fund, and it is undisputed that GE does not pay interest on things in a capital F fund. We only pay interest in the bond series-specific capital A accounts in connection with the bond series. The other sentence I would draw the Court's attention to in the indenture on that same point, although cut me off if I'm getting too much into the weeds. Actually, if I could finish what you're saying. Please, Your Honor. So what are we still to do with the language in the investment agreement that says the termination date is the business day prior to a date certain in 2026, and that the contract terminates on that time or upon earlier redemption? What's the general concept? The language in the GICs about termination? In the investment agreement. This is the bid specification set upon earlier redemption, but the agreements themselves did not. That's really my question. It's a very good question, Your Honor, and to understand why these agreements don't reflect all the same exact languages that are in the bid specs, one would need to understand how the industry worked at the time that these GICs were. It was an inconsistent practice. Some of them reflected it and some did not, right? In the summary judgment record, a very small minority of GE GICs, I think like 50 out of 1,700, had language similar to that or that one could read like that. The vast majority of them did not have that sort of language. It was the same sort of form as is at use in this case. You said termination on a date certain. The termination date provision, yes, Your Honor, because the normal practice was to rely on the interest payment provisions to do the work of deciding when GE still had to keep paying interest. In real life, what happened in these sorts of cases with these agreements is that when a bond series was redeemed, GE would be notified. They would stop paying interest upon that redemption because they'd be notified 30 days in advance, and then they'd return the money because the— There was no provision, no explicit provision that as a matter of law, an agreement between the parties said that it's all over when redemption happens. Well, the agreement itself could theoretically keep going. It just would, under the terms of Section 2.2 and the definitions of investment that Judge Schofield traced, we would owe no further interest on the deposit. So it wouldn't make much sense for the counterparty to keep the money with us if we didn't owe them interest. And I get that there may be some skepticism on that, and I did a little bit of looking to see if there were any simpler types of accounts that might have a similar approach to interest payments. And one example that I found relatively quickly is the U.S. government offers military accounts for people who are posted in combat zones, and they earn 10 percent interest for so long as they're posted in a combat zone and 90 days thereafter. And if they then leave the combat zone, the interest rate goes to zero. They can close the account at that point. They can leave it open. This case is like that. This is as though NYFA went to the combat zone, came back, and never told us, and we kept erroneously paying 10 percent interest to them when we didn't know it. So the fact that the contract itself contemplates that some money might be left with GE that we don't owe interest on is not unusual. And one other provision I'll point the Court to for that is at the bottom of Section 2.01, there's a few sentences handling what happens if the trustee sends GE NYFA's money without proper notice. And there, there is language that said unless GE accepts it, which it's not bound to do, accepts it as an investment, capital I investment, that money will not be deemed to be a capital I investment. So the contract already contemplates GE could be holding money that was transferred to it by NYFA without having to pay interest on it. And this is just one other circumstance is once there is no more bond series in connection with the investment agreement, the interest payment obligation ceases. On the prejudgment issue, interest issue, if we were to conclude that the award of prejudgment interest did represent a windfall for you, should we certify that question? That is, whether the contours, whether there is a windfall exception, the contours of that exception to the New York Court of Appeals? If the Court, if this Court were to conclude it was a windfall, then yes, we would be happy to have it certified to take another shot at it, Your Honor. I do think because it's not a windfall, though, under these facts, and certainly Judge Schofield was within her discretion to find it was not a windfall, we would argue that certification, that the Court of Appeals of New York would not get to the question because they'd find it wasn't a windfall anyway. That question was certified, as you know, I guess in 2017 to the New York Court of Appeals. They accepted but decided on the basis of another certified question. And what would happen in this case, in our opinion, Your Honor, is if they were to take the certification and look at the facts of the case, given that the jury applied this offset and cut our damages figure by over $9 million, the jury would find, the Court of Appeals would find that even if there could be a windfall exception, Judge Schofield was within her discretion to find there was no windfall on these facts. Thank you. Your Honor, thank you. Your Honor, the distinguished district judge made a mistake. She relied on the offset to damages as a reason not to award prejudgment interest. The offset was an amount that GE earned on the monies that NYFA had deposited, not on the interest. It was on the monies that NYFA had deposited. And that was, those were monies that had there been no breach on the jury's finding, GE would never have had because it wouldn't have kept the deposit. The deposit would have been returned. So that was an offset to damages which was appropriate, given the findings, but it has nothing to do with prejudgment interest. I just want you to appreciate what on the contractual analysis you just heard. On GE's analysis, the accounts disappear or no longer have funds, and the investment agreements remain in place for 20 years. On our analysis, the investment agreement accounts remain. Their money's in there. They continue to earn money. They may be used just as the indentures provide and as the float fund provision of the investment agreements provide to pay off other bonds. But that is what the agreements say. So, yes, Your Honor, Judge Carney, I do say they're wrong. It's not reasonable to be coming up with this superstructure of construct to imply terms that super sophisticated parties did not put in the agreements. On the issue of ambiguity. And your comment about the difference between the bid specifications and the actual agreements, that's meaningful, you say. Your Honor, we accept that the bid specifications said one thing and the agreements said another thing. And we also accept that the bid specifications also said the ultimate agreement shall conform to the bid specifications and in this respect it didn't. But that doesn't mean that the bid specifications then supersede the final agreement, which GE drafted, they didn't put in the provisions they want, and then it has a merger clause. So it is meaningful. The bid specifications, that's why this background evidence was never appropriate. You know, counsel cited 501C of the general indenture. That's the one that says that withdrawals may be made for such series of bonds as well as any other series of bonds unless specifically prohibited in a supplemental indenture. There's no prohibition in any of these supplemental indentures. Counsel points the court to the 2002 decision that the court made in international multifoods. The court, I would say that in 2000, the court relied on the phrase context, that the court can consider the context. In 2014, in the directions case, the court held the context doesn't mean that. It doesn't mean that you go beyond what New York law is, and this is from the first department in 2012 in Ashwood. The court looks solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources. Your Honors, the last thing I would say is that this reference to the fact that GE didn't get notice, it's the trustee that is supposed to give notice, and the truth is that if you look at page A1549 of the record, GE couldn't find whether or not there's a notice. There's an e-mail internally at GE saying, Bill, I genuinely don't have a clue where this notice could be. I don't know what Lynn or Kim did with these notices. Could they have thrown it away because they didn't know what it was for and never asked anyone? That's a possibility, but it's certainly not any malevolent conduct by NYFA. Thank you very much, Your Honors. Thank you both for your thoughtful arguments. The court will reserve decision. The final three cases, as I mentioned at the outset, are on submission. The clerk will adjourn court. Court is adjourned.